900 So.2d 1169 (2004)
MISSISSIPPI REAL ESTATE COMMISSION, Appellant
v.
Sarah Marie McCAUGHAN, Broker, Appellee.
No. 2003-CC-01153-COA.
Court of Appeals of Mississippi.
November 2, 2004.
Rehearing Denied February 8, 2005.
Certiorari Denied May 5, 2005.
*1170 John L. Maxey, Charles Richard Saltzman, Jackson, attorneys for appellant.
Stanley T. Ingram, Jackson, attorney for appellee.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. The Mississippi Real Estate Commission suspended Sara McCaughan's real estate broker's license for six months. McCaughan appealed, and the Rankin County Circuit Court overturned that order, finding that McCaughan was not given proper notice of the allegation and that *1171 the evidence did not support the suspension of her license. The Mississippi Real Estate Commission appeals, raising the following issues:
I. WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN FINDING THAT THE MISSISSIPPI REAL ESTATE COMMISSION FAILED TO PROVIDE ADEQUATE NOTICE ON THE ALLEGATION OF FAILURE TO SUPERVISE
II. WHETHER THE CIRCUIT COURT COMMITTED REVERSIBLE ERROR IN CONCLUDING THAT THE RECORD IN THIS CASE LACKED SUBSTANTIAL EVIDENCE TO SUPPORT THE REAL ESTATE COMMISSION'S DECISION TO SUSPEND MCCAUGHAN'S REAL ESTATE BROKER LICENSE
¶ 2. Finding that Sara McCaughan received proper due process, and also finding that the Mississippi Real Estate Commission's decision to suspend Sara McCaughan's license was based on substantial evidence, we reverse the decision of the circuit court and reinstate the order of the Commission.

FACTS
¶ 3. In August 2000, Susan Burton listed Leigh White and Gene Edward Rump's property, with a listing price of $197,500. The buyers made an offer on the property through Billy Lanthrip, a real estate agent who was hired by Sara McCaughan, a real estate broker. After all counteroffers, the parties agreed to a selling price in the amount of $170,000, and they agreed to a closing date of May 15, 2001.
¶ 4. On May 10, 2001, Lanthrip received a call from Scott Word, the buyer, advising him that there was a problem with an old debt that would prevent Word from qualifying for the mortgage. Word informed him that he had worked out a deal with BankPlus to pay $1,600 and remove the debt. The debt would be paid by increasing the purchase price and making the adjustments to the closing costs so that the sellers and buyers were netting the same amount of money. Lanthrip testified that he called the loan originator the next day, and advised him that he would write an addendum to the original contract. The addendum raised the selling price from $170,000 to $171,750, in order to pay the debt.
¶ 5. The closing was scheduled to take place in two sessions. Rump was at the first scheduled closing. A problem arose from the contract written by Billy Lanthrip with reference to the prepaid items. An "X" had been written over the "B" and an "S" written in. The sellers never initialed this change, but the buyers had initialed it. The closing attorney stated that the sellers do not usually pay the prepaid escrow items. Since the sellers had not initialed the item, the closing attorney said the contract was not valid. Lanthrip stated that Susan Burton was aware of the change and advised him that she would get the sellers to initial the change and send him a copy. Burton never sent Lanthrip a copy, even though he requested the copy several times from her.
¶ 6. In the second portion of the closing, scheduled at 4 p.m., Rump gave his wife, Leigh White, power of attorney to sign the settlement statement because he was unable to return at 4 p.m. Upset about having to pay the pre-paid closing costs and wary of signing a handwritten addendum, Lanthrip was unable to obtain White's signature on the addendum. After failing to obtain the signature of the sellers, Lanthrip wrote at the bottom of the addendum, "Sellers at closing refuse to sign."
*1172 ¶ 7. Both realtors accepted reduced commissions in order to consummate the closing. Rump and White demanded payment of $506.02 as reimbursement for pre-paid interest they paid at the closing. McCaughan brought the matter to the attention of Susan Burton's husband, who agreed to "take care of the matter." After that point, nothing was heard, and on September 25, 2001, Leigh White filed her complaint with the Mississippi Real Estate Commission (MREC).
¶ 8. On April 3, 2002, the MREC cited Susan Burton, Sara McCaughan, and Billy Lanthrip with violations of the Mississippi Real Estate Brokers License Act of 1954. McCaughan was cited in her relation as the supervision broker for Lanthrip. Specifically, their violations were stated in Mississippi Code Annotated § 73-35-21(1)(a) and (m) (Rev.2000):
(a) Making any substantial misrepresentation in connection with a real estate transaction;
(m) Any act or conduct, whether of the same or a different character than hereinabove specified, which constitutes or demonstrates bad faith, incompetency or untrustworthiness or dishonest, fraudulent or improper dealing.
The MREC also charged the parties with violations of the Rules and Regulations of the Commission:
IV.B.5. No licensee shall represent to a lender or any other interested party, either verbally or through the preparation of a false sales contract, an amount in excess of the true and actual selling price.
IV.E.2.g.5. "Reasonable skill, care and diligence"the agent must perform all duties with the care and diligence which may be reasonably expected of someone undertaking such duties.
¶ 9. After conducting a hearing, the Commission found Burton and McCaughan guilty of all the violations for which they had been accused. Lanthrip, who allowed his license to lapse without renewal, received no disciplinary action, but the MREC stated that it will review the complaint and the order before permitting Lanthrip to sit for the licensing examination should he wish to become licensed again. Burton was suspended from the practice of real estate for six months, followed by a probationary period of another six months. McCaughan was suspended from the practice of real estate for a period of six months and ordered to complete eight additional hours of continuing education. Her continuing education was to be completed during the time of her suspension.
¶ 10. McCaughan appealed the decision of the MREC to the Rankin County Circuit Court. The circuit court judge reversed the administrative order by concluding that the MREC's actions were arbitrary and capricious. He held that McCaughan was not provided with proper or adequate notice of the Commission's allegation of failure to supervise because the MREC failed to allege any supervisory misconduct in its complaint against McCaughan. The judge went on to find that neither McCaughan nor Lanthrip appeared to be guilty of any inappropriate action. This finding was based on the fact that the lending institution was informed by Lanthrip on no less than three occasions of the change in contract price. More importantly, according to the circuit court, it was the duty of the seller's agent, and not the duty of Lanthrip or McCaughan, to keep her clients informed. Based on the evidence, the judge stated that he could make no findings of bad faith or substantial misrepresentation.

ANALYSIS

STANDARD OF REVIEW
¶ 11. In reviewing an administrative agency's findings of fact, this court's authority, *1173 as well as that of the circuit court, is limited by the arbitrary and capricious standard of review. Mississippi Real Estate Comm'n v. Hennessee, 672 So.2d 1209, 1217 (Miss.1996). A court's review of a commission's disciplinary action is limited to a determination as to whether or not the commission's action is (1) supported by substantial evidence, (2) arbitrary or capricious, (3) beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. McDerment v. Mississippi Real Estate Comm'n, 748 So.2d 114, 118(¶9) (Miss.1999) (citations omitted). Deference is given to only an administrative board's knowledge within its own area of expertise, or afforded to an administrative agency's "construction of its own rules and regulations." Id.
¶ 12. Because the licensure statutes and regulations at issue are penal, the MREC is required to prove its case by clear and convincing evidence. The statutes and regulations at issue must be strictly construed in favor of McCaughan. McFadden v. Mississippi State Bd. of Medical Licensure, 735 So.2d 145, 152 (¶ 24) (Miss.1999); Hogan v. Mississippi Bd. of Nursing, 457 So.2d 931, 934 (Miss.1984).

I. DID THE TRIAL COURT ABUSE ITS DISCRETION IN FINDING THAT SARA MCCAUGHAN WAS DENIED DUE PROCESS OF THE LAW?

(A) Did Sara McCaughan Receive Adequate Notice of the Allegation of Her Failure to Supervise?
¶ 13. McCaughan argues that since nowhere in the original complaint was she charged with failure to supervise, she was left to speculate as to what went wrong. McCaughan argues that she was denied due process because she was unable to understand what violations she was charged with, leading to a defense that was "nothing more than a shotgun approach attempt to a very generalized complaint." This position is inconsistent with the defense she prepared at the hearing and the specificity of the complaint she received.
¶ 14. At the hearing before the Commission, McCaughan's attorney stated, "For the benefit of the Commission, Sara McCaughan is here today as the responsible broker. I want to make sure that is clarified." McCaughan's initial response to the complaint and her testimony before the Commission both demonstrate that she was well aware of her duty as the responsible broker and of the possible sanctions that could be imposed should she be cited for the failure to supervise, and she prepared her defense accordingly. In her testimony before the Board, she outlined the extensive application and interview procedure she goes through with every applicant who desires to be a salesperson under her. In her testimony, she stated that she relies heavily on the personal interview when hiring subordinates; that many questions are asked about character; that she has her own training classes; that she gives a significant amount of one-on-one training for her new salespeople; that she has home inspectors, appraisers, and mortgage people come out and talk; that her job involves constant supervision, to the point that she sometimes calls it babysitting; and that she has prepared a folder that contains every piece of paper needed to write an offer. The fact that she found it necessary to bring up the procedures she uses to train new salespeople demonstrates that she was aware that her charges resulted from an alleged failure to supervise.
¶ 15. The circuit court judge compared the notice requirement in the MREC hearing to notice requirements in criminal *1174 cases. This analogy is flawed because the Mississippi Supreme Court has ruled that administrative proceedings are not held to the same due process standards as criminal cases. Administrative proceedings deal with people who have specialized knowledge or have earned licenses based on specific knowledge. In Harris v. Mississippi Real Estate Comm'n, 500 So.2d 958, 963 (Miss.1986), the Mississippi Supreme Court stated, "The agency charged with regulating certain activities knows best how to police its own. This seems especially true where an agency commission comprised of fellow practitioners, as is the Real Estate Commission, sits in judgment of one of its own."
¶ 16. The Mississippi Supreme Court decided a case similar to the one at hand in Mississippi Board of Veterinary Medicine v. Geotes, 770 So.2d 940 (Miss.2000). In Geotes, the court affirmed the agency's decision to revoke a veterinarian's license. The veterinarian, who was charged with a failure to supervise his staff, argued that the complaint against him was not specific enough to satisfy due process. The court found that due process was satisfied because the complaint specifically mentioned the statute allegedly violated and the veterinarian had the opportunity to respond to the charges against him. Id. at 941(¶1). Likewise, in this case, McCaughan was charged with violating specific statutes. Mr. Rump and Ms. White sent a letter to the MREC on September 23, 2001, expressing their concerns with the closing. McCaughan received this letter and responded to it. The MREC filed a formal complaint against McCaughan on April 3, 2002, and the hearing by the MREC was held on August 27, 2002. She had adequate time to prepare a defense, and if she were unclear as to the specific conduct that led to the complaint against her, she had time to inquire why a complaint was filed against her. The court in Geotes explained how due process relates to administrative hearings:
Courts have never required that there be a particular form of notice or that particular procedures be adopted in order to satisfy constitutional due process requirements. Rather, it is well established that due process "is not a ... fixed content unrelated to time, place and circumstances." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Indeed, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The fundamental requirement of due process is simply the opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citations omitted).
Geotes, 770 So.2d at 943(¶ 13).
¶ 17. McCaughan uses Geotes to argue that McCaughan was never cited for a violation of Mississippi Real Estate Commission Regulation IV.(A)(1), which states:
It shall be the duty of the responsible broker to instruct the licensees licensed under that broker in the fundamentals in real estate practice, ethics of the profession and the Mississippi Real Estate License Law and to exercise supervision of their real estate activities for which license is required.
McCaughan argues that it is necessary for the MREC to have alleged a violation of this regulation in order to be disciplined based on a lack of supervision. We disagree. Since the MREC never charged McCaughan with a violation of this regulation, it was not necessary for her to have been cited for this violation in order to be *1175 disciplined. Thus, the cases McCaughan relies upon which hold that due process requires proper notice of the allegations upon which the Commission bases its disciplinary actions are not analogous in this case.
¶ 18. The Mississippi Supreme Court has upheld the constitutionality of the type of notice and hearing provided for in this case. In Nelson v. Mississippi State Bd. of Veterinary Med., 662 So.2d 1058, 1061 (Miss.1995), the Veterinary Board sent Dr. Nelson a letter informing him of the statutory sections he was alleged to have violated, and notifying him of the time and place of the hearing. The Mississippi Supreme Court found that the letter delineating the code section that Nelson was suspected of violating was adequate notice. Id. at 1062. McCaughan received proper notice of the allegations for which she was charged.

(B) Was Sara McCaughan's Suspension Disproportionate to the Seriousness of Her Offense?
¶ 19. McCaughan believes that her six month suspension of her license is unduly harsh, believing that any punishment she may receive should be remedial rather than punitive. She argues that the record reflects that her due process rights were violated as a result of an inequitable and disproportionate administration of discipline. In particular, she invites us to consider Ticktin v. Dep't of Prof'l Regulation, 550 So.2d 518 (Fla. Dist. Ct.App. 1989). In Ticktin, the hearing officer recommended that the physician's license be suspended rather than revoked. The Department of Professional Regulation rejected this recommendation because it believed the hearing officer's recommendation was too lenient. The Ticktin court reversed the Department of Professional Regulation because the Department's stated reason for rejecting the hearing officer's recommendation was not supported by statute or case law. Id. By contrast, the MREC clearly has the authority to suspend McCaughan's license. Mississippi Code Annotated § 73-35-21(1) (Rev.2000) has given the MREC such authority:
The commission may, upon its own motion and shall upon the verified complaint in writing of any person, hold a hearing for the refusal of license or for the suspension or revocation of a license previously issued, or for such other action as the commission deems appropriate. The commission shall have full power to refuse a license for cause or to revoke or suspend a license where it has been obtained by false or fraudulent representation, or where the licensee in performing or attempting to perform any of the acts mentioned herein, is deemed to be guilty of:
(a) Making any substantial misrepresentation in connection with a real estate transaction;
...
(m) Any act or conduct, whether of the same or a different character than hereinabove specified, which constitutes or demonstrates bad faith, incompetency or untrustworthiness or dishonest, fraudulent or improper dealing.
The MREC's finding that McCaughan is guilty of these violations is supported by substantial evidence, as we will discuss later.
¶ 20. Equally important for McCaughan, the complaint counsel for the MREC recognized the distinctions between the culpability and actions of Susan Burton and those of Sara McCaughan. His statement to the Commission illustrates to McCaughan that any sanctions she may receive shall be remedial rather than punitive:

*1176 So it seems to me that we've got a relatively easy case to resolve in terms of facts. We have got a little more difficulty in imposing the penalty or discipline that would be appropriate, particularly with regard to Ms. Burton. Again, she doesn't contest the facts that there was an improper act, at least one committed. There certainly was not proper disclosure among the parties. She was not tending to her business for the reasons, I suppose, that she advanced. And, I would submit that she is and should have discipline that reflects the severity of the violations and that Ms. McCaughan should have some discipline, but it would be much of a remedial nature.
McCaughan argues that she was denied due process for receiving the same penalty as Burton, even though McCaughan was less culpable. She cites no authority for this proposition, and we are unable to infringe upon the agency's disciplinary authority. In Flowers v. Mississippi Dep't of Human Servs., 764 So.2d 493 (Miss.Ct. App.2000), the appellant maintained that the discipline she received was disproportionate to her offense. This Court stated:
We may not engage in a reconsideration of the appropriate penalty. If we determine that the decision is supported by substantial evidence, is neither arbitrary nor capricious, is not in violation of some statutory or constitutional right of the employee, and was not beyond the power of the administrative agency to make, we are to affirm.
Id. at 494-95 (¶7) (citing Miss. State Tax Comm'n v. Vicksburg Terminal, Inc., 592 So.2d 959, 961 (Miss.1991)). We also disagree with McCaughan's statement that she received the same discipline as Burton. Burton's real estate license was suspended for six months, and she was placed on probation for another six months. McCaughan received no order of probation.

II. DID THE CIRCUIT COURT COMMIT REVERSIBLE ERROR IN CONCLUDING THAT THE RECORD IN THIS CASE LACKED SUBSTANTIAL EVIDENCE TO SUPPORT THE REAL ESTATE COMMISSION'S DECISION TO SUSPEND MCCAUGHAN'S REAL ESTATE BROKER LICENSE?

(A) Did the Actions of Billy Lanthrip Violate the Rules of the Mississippi Real Estate Commission?
¶21. The circuit court in its bench ruling held that Lanthrip violated no laws or rules or regulations of the Mississippi Real Estate Commission. It opined that it was the duty of the selling agent, not the duty of Mr. Lanthrip, to disclose all the information relevant to the sales contract. In her appeal, McCaughan brings to the attention of this Court other factors that show that Lanthrip did not violate any laws or rules or regulations. She notes that all parties were aware of the change in sales price and agreed to it, and that Lanthrip sought full and complete disclosure through the addendum to the real estate contract. Although these facts are true, the MREC was aware of these facts at the hearing, and they considered these facts in their holding that Lanthrip made substantial misrepresentations and conducted himself in a manner that demonstrates bad faith, incompetency or untrustworthiness. This holding of the MREC was based on substantial evidence.
¶22. Lanthrip had knowledge of what Burton put in the sales contract. On the attached seller's disclosure statement, Lanthrip put an "X" by the buyers as his client and also put an "X" as a disclosed dual agent. The evidence at the hearing established that Lanthrip was not an *1177 agent, but just representing the buyers. This shows a substantial misrepresentation. Lanthrip changed the contract price to provide for Mr. Word to receive $1,600 from Leigh White. Lanthrip clearly understood that this $1,600 would be applied to a debt, but he never disclosed that fact to the sellers. The sellers were never fully informed as to what the $1,600 would be applied. Lanthrip did not allow Ms. White to see the handwritten addendum that changed the contract price to $171,500. The debt is not listed on the HUD-1 settlement statement dated May 15, 2001. Lanthrip allowed the buyers and sellers to sign a statement certifying that they had no knowledge of any loans that had been made other than what was listed in the contract at closing. Stated differently, the MREC heard evidence that Lanthrip was involved in the preparation of a false contract and allowed the sellers to sign a settlement statement falsely certifying that they had no knowledge of loans other than what was listed in the contract while knowing what Burton had put in the sales contract and refusing to let the sellers read the addendum. This evidence was sufficient to make a finding of substantial misrepresentation, as well as a finding of bad faith, incompetency, or untrustworthiness, in violation of Mississippi Code Annotated § 73-35-21(1)(a) and (m). Although McCaughan makes an argument asserting that no substantial evidence exists to support the MREC's decision, we find that such evidence does exist in this case, and we must affirm even if we believe that the preponderance of the evidence supports a different outcome. Mississippi Employment Sec. Comm'n v. Claiborne, 872 So.2d 698, 700(¶4) (Miss.Ct. App.2004) (citing Miss.Code Ann. § 71-5-531 (Rev.2000); Caraway v. Mississippi Employment Sec. Comm'n, 826 So.2d 100, 102(¶7) (Miss.Ct.App.2002)). In other words, we must defer to the administrative agency's findings if there is even a quantum of credible evidence which supports the agency's decision. Hale v. Ruleville Health Care Center, 687 So.2d 1221, 1224 (Miss.1997). McCaughan violated the law in her supervisory capacity. Article IV.(A)(2) of the Rules and Regulations of the Mississippi Real Estate Commission states that the responsible broker shall at "all times be responsible for the actions of the affiliated broker to the same extent as though that licensee were a salesperson."
¶23. McCaughan believes that it is important to note that all parties agreed to the increase in price. Even though the sellers never refused to pay higher closing costs in exchange for a higher sales price, the sellers did not agree to the change at the time of the closing. Even though the parties eventually understood the significance of raising the contract price to $171,750, the sellers were unaware that the contract price had been changed on the day the closing was to occur. They agreed to the arrangement proposed by BankPlus only after the day the closing was to take place, when all the parties were desperate to consummate the sale of the house. Lanthrip attempted to obtain the sellers' signature on the contract even though he knew that the sellers had not yet agreed to pay the higher closing costs.
¶24. McCaughan also submits that she should be relieved of being charged with misrepresentation because she never represented the sellers. In fact, she argues, it would be a violation of professional conduct to represent the sellers. We disagree. The MREC does not hold McCaughan in violation of misrepresentation for failing to give advice to the sellers. The MREC has charged McCaughan in violation of misrepresentation because her subordinate refused to allow the sellers to read the sales contract that had been modified and attempted to consummate the *1178 sale by obtaining the sellers' signatures. Certainly, McCaughan owed a duty to disclose to the sellers, or at least to allow the sellers to read, the modifications to the contract before requesting a signature on that contract. We decline to deny the MREC the authority to discipline a real estate agent who has deceived a seller, regardless of whether the agent is representing that party, and regardless of whether that party actually relied on this deception.
¶25. The MREC contends that McCaughan, in her role as Lanthrip's supervising or responsible agent, failed to supervise Lanthrip in a proper manner. The MREC argues that it is not necessary to find that Lanthrip violated the statutes or the rules and regulations. The dissent finds this argument to be unusual. We believe it is necessary to clarify the point the MREC made. The MREC was unable to find any violations on the part of Lanthrip because he allowed his real estate license to lapse; he was therefore unable to be subjected to the discipline of the MREC. The MREC believes, correctly in our opinion, that formal charges against Lanthrip are not a necessary first step in finding McCaughan guilty in her supervisory capacity. While Lanthrip escaped formal charges from the MREC, they never found Lanthrip's actions to be proper. The evidence shows that the MREC found Lanthrip's actions to be improper, and McCaughan can be guilty of her misrepresentation as a result of these actions.
¶26. The dissent takes the position that the role of the closing attorneys was crucial. He contends that it is the role of the attorneys and the sellers' real estate agents to present all documents to the parties for execution, receive and disburse all closing funds, answer questions relating to the closing documents, and ensure that the closing is completed in accordance with the parties' agreement and the mortgage lender requirements. All of this is true, and the MREC does not expect the realtors or attorneys for the buyers to do such things for the sellers. Clearly, the sellers' attorney and not McCaughan had the responsibility to advise the sellers as to the legal implications of the closing documents, but that is not the point, nor is it the reason the parties were charged with substantial misrepresentation. Lanthrip, and McCaughan in her supervisory capacity, committed a substantial misrepresentation by failing to inform the sellers that the contract had been changed and by attempting to obtain their signature on a document that they agreed to only when they desperately[1] wanted to sell their house. Even though Lanthrip's performance is somewhat excusable due to his inexperience, it does not require the skill of an attorney or a seasoned real estate agent to inform a seller that a contract has been modified.

(B) Is Sara McCaughan Guilty of a Failure to Supervise?
¶27. In this appeal, McCaughan argues that there was no substantial evidence for the MREC to suspend her license because the MREC made no findings of fact that she was absent at a time when she should have been; that she was not thorough in her requirements of her salespersons; or that she was not responsible in choosing not to conduct the closing herself. It is not necessary for the MREC to make such specific findings to hold McCaughan responsible for the actions of Lanthrip, and there was sufficient evidence *1179 to hold McCaughan responsible for her failure to supervise. The evidence at the hearing shows that McCaughan was aware of the complications that might occur at the closing, and she did nothing about it once she was informed of the situation that occurred at the closing. She testified that she knew of the potential for problems at this particular closing and did nothing to intervene personally or to direct somebody with more experience to get involved. She testified that she was alarmed by the fact that the contract had been changed but there had been no signature by the seller to show their agreement to these changes, but she did not do anything about it. The order from the MREC states that "the extent and quality of supervision of Salesperson Lanthrip by representative McCaughan was inadequate and insufficient and was therefore in violation of Commission rules and regulations." This order was substantiated by the testimony and evidence.
¶28. The evidence at the hearing showed that Lanthrip had been inadequately trained and improperly supervised. At the time of the closing, Lanthrip had been licensed for a little over one year and had completed only one previous closing. Lanthrip testified that he had only one day of actual formal training. McCaughan's attorney asked Lanthrip about other staff brokers offering to go with him on various visits and closings to work with him on preparing contracts and to give him the guidance he needed. Lanthrip replied that no broker had ever offered to help him in that regard. He stated that he had written out the contract that is the source of this complaint, and he did so without any assistance. He stated that at no time did anybody come in and explain to him word for word what he should put in what blank. Lanthrip summarized his training in this way: "I was given a packet and basically I taught myself."
¶29. The record also shows that McCaughan was aware that Lanthrip was not qualified to conduct real estate closings, proving that she should have taken steps to make sure Lanthrip was properly supervised. On November 1, 2001, she wrote a letter to the MREC stating, "Billy's level of knowledge is insufficient." When she became aware of the problems that had surfaced in this closing, her advice to Lanthrip was to "stay on top of it." McCaughan later fired Lanthrip. At the hearing, she testified why:
It was also evident to me that he needed more training. He had since taken a full time job, and was going to take him five days to arrange a meeting with me to talk about this. And I just felt like I couldn't take responsibility anymore for him. And it wasn't that I ever felt like he did any of this transactionhe had any ill notions in this transaction. Its just that they've got my license in their hand. And if they don't even have time to meet with me, they don't have time to learn what they need to know.
¶30. Dale Pruitt, McCaughan's partner and principal owner of McCaughan and Pruitt Realty, was aware of the need to increase the sales price. Lanthrip discussed the problem with Pruitt, who advised him to prepare a handwritten addendum to the contract that corrected the amount of the sales price to be $171,750. McCaughan's firm should have prohibited an inexperienced agent who had completed only one other real estate transaction to undertake such a difficult real estate closing without supervision.
¶31. McCaughan suggests that the testimony of Lanthrip might not be credible because McCaughan terminated him some time before the hearing. Accordingly, she argues that Lanthrip may have seen his testimony as revenge against her and submits *1180 that we should place greater weight on the testimony of McCaughan herself. She then refers to her own testimony which she claims shows that she adequately supervised Lanthrip. For instance, she conducted an adequate background check with no derogatory information on Lanthrip; she conducted an extensive interview with Lanthrip; she provided training classes, including one-on-one training; she provided constant supervision and access to herself; she always reviewed and approved all real estate closings; and she or one of her subordinates closely followed this particular real estate contract from initiation to closing. We decline to reanalyze the evidence presented at the hearing, and we are unable to do so. Mississippi jurisprudence is clear that an appellate court is unable to reweigh the facts in a given case or substitute its judgment for the agency's judgment. Trading Post, Inc. v. Nunnery, 731 So.2d 1198, 1200(¶6) (Miss.1999) (citing Allen v. Mississippi Employment Sec. Comm'n, 639 So.2d 904, 906 (Miss.1994)). While McCaughan may have procedures that allow her real estate agents to be well-trained and adequately supervised, the evidence shows that, in Billy Lanthrip's case, he did not receive the benefit of these procedures. The evidence McCaughan urges this Court to consider in persuading us to reverse the decision of the MREC was introduced at the hearing. The MREC weighed this evidence, and it is not within the scope of our authority to second-guess this agency.
¶32. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS REVERSED AND THE ORDER OF THE MISSISSIPPI REAL ESTATE COMMISSION IS REINSTATED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., MYERS AND ISHEE, JJ., CONCUR. IRVING, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J., AND BARNES, J. BRIDGES, P.J., NOT PARTICIPATING.
IRVING, J., Specially Concurring:
¶33. I agree with the majority that the decision of the Mississippi Real Estate Commission (Commission) should be affirmed. However, I write separately to express my views regarding some matters which I think neither the majority nor the dissent adequately discusses or brings into proper focus.
¶34. As a basis for affirming the Commission the majority states that:
Lanthrip was involved in the preparation of a false contract and allowed the sellers to sign a settlement statement falsely certifying that they had no knowledge of loans other than what was listed in the contract while knowing what [Susan] Burton [the listing agent] had put in the sales contract and refusing to let the sellers read the addendum.
Majority opinion at (¶22). The majority finds that Lanthrip's actions constituted sufficient evidence from which the Commission could find that he engaged in substantial misrepresentation and that his actions amounted to bad faith, incompetency or untrustworthiness, all in violation of Mississippi Code Annotated section 73-35-21(1)(a) and (m) (Rev.2000).
¶35. The dissent finds no problem with Lanthrip's action because (1) he was representing the interests of the buyers only, (2) the sellers, Leigh White and Gene Edward Rump, were represented by Burton and the law firm of Taylor, Covington and Smith, P.A., and (3) and neither he nor his *1181 supervisor, Sara McCaughan, made a false statement or misrepresentation to the sellers.
¶36. First, it seems to me that the dissent misses the point with its focus on the identity of persons representing the sellers and on the lack of evidence supporting a finding that Lanthrip "made a false statement or misrepresentation to the sellers." In my judgment, it is immaterial to the proper resolution of the issue before us that the sellers were ably represented by persons other than Lanthrip and that Lanthrip did not make a false statement or misrepresentation to the sellers.
¶37. What is required is that he not make "any substantial misrepresentation in connection with a real estate transaction" or commit "[a]ny act or conduct . . . which constitutes or demonstrates bad faith, incompetency or untrustworthiness, or dishonest, fraudulent or improper dealing." Miss.Code Ann. § 73-35-21(1)(a)(m) (Rev.2000). (emphasis added). There is a manifest difference in making a misrepresentation in connection with a real estate transaction and making a misrepresentation to the sellers in the transaction. To illustrate my point, is a lie less than a lie simply because the hearer of the lie knows that it is a lie and is not deceived by it? If it is a violation of the law for the teller of the lie to lie, has the liar not broken the law simply because his hearers knew he was lying and were not deceived by it? Of course, he has broken the law.
¶38. The Commission is authorized by section 73-35-21(1)(a)(m) to suspend any license previously issued by it where the licensee is found guilty of making any substantial misrepresentation in connection with a real estate transaction. Rule IV. B.5. of the Commission's Rules and Regulations prohibits a licensee from "represent[ing] to a lender or any other interested party, either verbally or through the preparation of a false sales contract, an amount in excess of the true and actual selling price."
¶39. It is not disputed that Lanthrip prepared the addendum to the sales contract which was to become a part of the contract. It is also undisputed that Lanthrip represented to BankPlus, via the addendum, that the sales price had been changed from $170,000 to $171,750. In my judgment, when Lanthrip made this representation to BankPlus, he violated Commission Rule IV.B.5. and subsection (1)(a) of section 73-35-21. The violation occurred notwithstanding the fact that neither the sellers nor the bank was deceived or misled. It was a violation because the addendum, which Lanthrip prepared, contained an amount for the sale price which represented "an amount in excess of the true and actual selling price." The true and actual selling price remained at $170,000. The additional amount of $1,750 represented a loan to the borrowers for the purpose of assuring the financing of the transaction by BankPlus.
¶40. In this real estate transaction, it was illegal for any part of the sale price to be used for any loans to the borrowers or for the purpose of financing the transaction, other than those described in the sales contract or addenda. That is why the contract sale price could not be adjusted to accomplish what was attempted to be accomplished by the addendum.
¶41. On these facts, I agree with the result reached by the majority because, while I do not find that Lanthrip prepared a false contract, I do find that he prepared a false document which he intended to become binding on the parties as an addendum to the contract and that he verbally represented to BankPlus an amount in excess of the true and actual selling price of Leigh White and Gene Edward Rump's home. I also agree with the majority that *1182 Lanthrip engaged in improper dealing as a dual agent.
¶42. Finally, I agree that McCaughan, as Lanthrip's supervisor, was guilty of failing to properly supervise Lanthrip. There is no question that what was attempted to be accomplished by the addendum, which Lanthrip prepared with McCaughan's blessing, was improper. Surely, she knew better but allowed Lanthrip to proceed anyway.
CHANDLER, J., JOIN THIS SEPARATE OPINION.
GRIFFIS, J., Concurring in Part and Dissenting in Part:
¶43. In issue I, the majority finds that the notice given was sufficient and the penalty was within the discretion of the MREC. I concur with the majority that the notice given McCaughan was sufficient. Because I dissent from the majority and find, in issue II, that substantial evidence was not present to support the MREC's finding of a violation, I disagree with and dissent from the majority's finding that the discipline was appropriate.
¶44. As to issue II, however, I disagree with and dissent from the majority's determination that this court should decline to re-analyze the evidence presented and reverse and reinstate the MREC decision. Based on my analysis, I would affirm the circuit court.
¶45. I agree with the majority that the MREC decision is entitled a certain amount of deference. Indeed, this Court may not reweigh the facts or substitute its judgment for an administrative agency. Trading Post, Inc. v. Nunnery, 731 So.2d 1198, 1200(¶6) (Miss.1999). Here, however, we must not blindly accept the administrative agency's decision; instead, we must review the record to determine whether there was substantial evidence to support the administrative agency's decision. Mississippi Employment Sec. Comm'n v. Claiborne, 872 So.2d 698, 700(¶4) (Miss.Ct. App.2004).
¶46. I begin my analysis with a discussion of the burden of proof. It is well settled that the MREC had the burden to present testimony which clearly established McCaughan's guilt. Mississippi Real Estate Comm'n v. White, 586 So.2d 805, 808 (Miss.1991); Harris v. Mississippi Real Estate Comm'n, 500 So.2d 958, 962 (Miss.1986); Mississippi Real Estate Comm'n v. Ryan, 248 So.2d 790, 793-94 (Miss.1971). The appropriate burden of proof is not beyond a reasonable doubt. Id. However, the supreme court has held that "disciplinary charges against a professional must be proved by clear and convincing evidence." White, 586 So.2d at 808. While we do not review the MREC decision de novo, we must review the decision with "heightened scrutiny," McDerment v. Mississippi Real Estate Comm'n, 748 So.2d 114, 122(¶26) (Miss.1999) (Justice Waller, concurring), that is required to establish guilt by clear and convincing evidence. In Ryan, the supreme court admonished the MREC to use with caution its authority to suspend or take away the license of one to do business and practice in their profession. Ryan, 248 So.2d at 793.
¶47. Unlike many administrative agency appeals that we consider, the heightened burden of proof here requires that we thoroughly and carefully review the factual and legal conclusions to determine whether there was substantial evidence to support the MREC decision. Substantial evidence is defined as "`such relevant evidence as reasonable minds might accept as adequate to support a conclusion' or to put it simply, more than a `mere scintilla' of evidence." Tucker v. Prisock, 791 So.2d 190, 192(¶11) (Miss.2001) (quoting Johnson *1183 v. Ferguson, 435 So.2d 1191, 1195 (Miss.1983)). The standard requires a substantial basis of fact from which the fact in issue can be reasonably inferred. Cives Steel Co. Port of Rosedale v. Williams, 2003-WC-00860-COA, ___ So.2d ___, 2004 WL 1192533 (Miss.Ct. App.2004). Therefore, we must examine the evidence as a whole and where the record reveals that the MREC decision was based on a mere scintilla of evidence and was against overwhelming weight of the credible evidence then the appellate court should not hesitate to reverse. Johnson v. Ferguson, 435 So.2d 1191, 1194-95 (Miss.1983); Universal Mfg. Co. v. Barlow, 260 So.2d 827 (Miss.1972).
¶48. McCaughan's real estate brokers license was suspended based on the following "Findings of Fact" and "Conclusions of Law:"

FINDINGS OF FACT

IV.
The Commission received a sworn statement of the complaint from Leigh White and Gene Edward Rump of Jackson, Mississippi on or about September 25, 2001. On or about August 14, 2000, Respondent Burton listed Leigh White and Gene Edward Rump's property in Brandon, Mississippi with a listing price of $197,500.00. On or about April 28, 2001, Ellie and Scott Word made an offer on the property through Billy Lanthrip in the amount of $163,900.00. After further counteroffers, all parties agreed to a selling price in the amount of $170,000.00. A closing date of May 15, 2001 was agreed upon by all parties. On or about May 10, 2001, Lanthrip received a call from Scott Word advising him that there was a problem with an old debt. Mr. Word informed him that he had worked out a deal to pay $1,600.00 and remove the debt. On or about May 11, 2001, Mr. Lanthrip maintains that he called Brad Benton at BankPlus who was the buyer's loan originator and advised him that he would write an addendum to the contract dated April 29, 2001. (Mr. Benton testified that he was aware of the change in the sales price.) The addendum reads in part as follows:
Seller agrees to pay buyer $1600.00 at the time of closing. Contract price has been amended to cover the $1600.00 payment. Contract price has been changed from $170,000.00 to $171,750.00. This addendum was signed and dated by the buyers on May 11, 2001.
The following was written by Mr. Lanthrip on the day of closing: "Seller at closing refused to sign, date 5/15/01". It was signed by the buyers and Billy Lanthrip, not the sellers.
V.
The closing set for May 15, 2001 was to be a two part closing. Gene Edward Rump was at the first scheduled closing at 1 p.m. on May 15, 2001. However, a problem arose from the contract written by Billy Lanthrip with McCaughan and Pruett with reference to the prepaid and escrow items an "x" had been marked over the "B" and the "S" written in, this change was never initialed by the sellers, Leigh White and Gene Edward Rump. The buyers, Anthony S. Word and Ellie B. Word had initialed the change. Jackie Root, the closing attorney, said that the sellers did not normally pay the prepaid escrow items. Since that item has not been initialed, Ms. Root said the contract was not valid. Lanthrip stated that Susan Burton was notified about the change and advised him that she would get the sellers to *1184 initial the change and send him a copy. Ms. Burton never sent Mr. Lanthrip a copy, even after he requested a copy several times from her. Rump signed the closing papers, except for the HUD-1 settlement statement. The second portion of the closing was scheduled for 4 p.m. the same day. Gene Edward Rump gave his wife, Leigh White power of attorney so that she could sign the HUD-1, because he could not return at 4 p.m. that day.
VI.
At the closing on May 15, 2001, in the law offices of Taylor, Covington and Smith, P.A., Leigh White, one of the sellers, wrote a check (check number 7763) from the account of Leigh White and Gene Edward Rump in the amount of $1600.00 to Scott Word. Gene Edward Rump was not present at this closing. The $1600.00 is not listed on the HUD-1 settlement statement dated May 15, 2001 pertaining to the property located at [address omitted], Brandon, Mississippi.
After the closing, check number 7078 in the amount of $116.02 was paid to Gene E. Rump and Leigh A. White, dated May 16, 2001 and paid from the account of Susan Burton Real Estate LLC for some of the prepaid items.
CONCLUSIONS OF LAW
VII.
The above and foregoing acts of the Respondents Susan Burton, Sara McCaughan, and Billy Lanthrip constitute a violation of the Mississippi Real Estate Brokers License Act of 1954, as amended, more specifically § 73-35-1, et seq. Miss.Code Ann., more specifically, § 73-35-21(1)(a) and (m):
(a) Making any substantial misrepresentation in connection with a real estate transaction;
(m) Any act or conduct, whether of the same or different character than hereinabove specified, which constitutes or demonstrates bad faith, incompetency or untrustworthiness or dishonest, fraudulent or improper dealing
and constitute violations of the Rules and Regulations of the Commission, more specifically:
IV.B.5. No licensee shall represent to a lender or any other interested party, either verbally or through the preparation of a false sales contract, an amount in excess of the true and actual selling price.
IV.E.2.g.5. `Reasonable skill, care and diligence'the agent must perform all duties with the care and diligence which may be reasonably be expected of someone undertaking such duties.
The Commission further finds that the extent and quality of supervision of salesperson Lanthrip by Respondent McCaughan was inadequate and insufficient and therefore was in violation of Commission rules and regulations.
¶49. The MREC found violations by Burton, McCaughan and Lanthrip. However, only McCaughan appealed the MREC Order. I read the order to make two separate determinations about McCaughan.

A. Did McCaughan, individually and not in her supervisory capacity of Lanthrip, violate the applicable statutes or rules and regulations?
¶50. First, the language used in paragraph VII of the Order appears to indicate that the MREC held that McCaughan, just as Burton and Lanthrip, personally violated Mississippi Code Annotated Section 73-35-21(1)(a) *1185 and (m) and the MREC rules and regulations. In other words, it seems that the MREC found that McCaughan actively and directly participated in the wrongful conduct. The factual findings do not support this conclusion.
¶51. The MREC Order clearly and specifically detailed this real estate transaction. McCaughan's name was mentioned only once in the findings of fact. In paragraph V, the MREC found that Lanthrip was employed by McCaughan's firm. There is no language in the MREC's Order or any evidence in the record to support a conclusion that McCaughan was personally, actively or directly involved in this transaction. After a thorough review of the record, I find absolutely no evidence to support the conclusion that McCaughan, in her individual and non-supervisory capacity, violated any statute or rule or regulation. Thus, I am of the opinion that the initial MREC finding was not based on substantial evidence and turn to the consideration of evidence that McCaughan failed to properly supervise Lanthrip.

B. Did McCaughan fail to adequately and sufficiently supervise Lanthrip?
¶52. The MREC's second conclusion was that McCaughan inadequately and insufficiently supervised Lanthrip. To support the MREC order, the record must contain substantial evidence to support the finding that (a) Lanthrip, as McCaughan's employee, violated the applicable statutes or the rules or regulations, and (b) that Lanthrip's violations resulted from McCaughan's inadequate or insufficient supervision.

1. Did Lanthrip, as McCaughan's employee, violate the applicable statutes or rules and regulations?
¶53. The MREC contends that McCaughan, in her role as Lanthrip's supervising or responsible broker, failed to supervise Lanthrip in a proper manner. The MREC argues that it is not necessary to find that Lanthrip, the salesperson under McCaughan's supervision, violated the statutes or the rules and regulations. This is an unusual argument. Lanthrip's actions were the sole basis for the MREC's charges against McCaughan. If Lanthrip's actions were determined to be proper, I fail to see how McCaughan's supervision could possibly become an issue that would merit discipline. To impute responsibility to McCaughan as the supervising or responsible broker, I am of the opinion that there must be substantial evidence of a violation by the subordinate real estate agent, Lanthrip. I review the alleged violations separately.

a. Did Lanthrip make a misrepresentation?
¶54. First, the MREC found that Lanthrip made substantial misrepresentation in violation of Mississippi Code Annotated Section 73-35-21(1)(a). The MREC never specifically states what "misrepresentation" was made. Apparently, the MREC makes a general allegation that Lanthrip presented a "false sales contract" but there is no precise explanation of what about the contract in issue was false.
¶55. After my review of the record and the MREC order, the essence of my conclusion is that I simply find nothing false or deceptive about Lanthrip's actions. I find no allegation that Lanthrip made a false statement to procure the contract, that he misled any party about the terms of the contract or that his statements led to the deception of any party involved. The MREC merely alleges that the sellers were unaware of the consequences of the $1,600 payment made by the sellers to the buyers after the closing; therefore, following *1186 the MREC logic, this supposedly established a false sales contract.
¶ 56. Mississippi Code Annotated Section 73-35-21(1)(a)(Rev.2000) allows the MREC to revoke or suspend a license if the real estate agent makes "any substantial misrepresentation." However, the term "misrepresentation" is not defined in the Mississippi Real Estate Brokers License Law of 1954, codified at Mississippi Code Ann. Section 73-35-1 et seq. (Rev. 2000). Misrepresentation is defined, in Black's Law Dictionary 1016 (7th ed.1999), as:
Any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts. An untrue statement of fact. An incorrect or false representation. That which, if accepted, leads the mind to an apprehension of a condition other and different from that which exists. Colloquially it is understood to mean a statement made to deceive or mislead.
¶ 57. Our courts routinely discuss the elements of negligent and fraudulent misrepresentation. For example, the elements of "negligent misrepresentation" are:
(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the defendant failed to exercise that degree of diligence and expertise the public is entitled to expect of it; (4) that the plaintiff reasonably relied on the defendant's representations; and (5) that the plaintiff suffered damages as a direct and proximate result of his reasonable reliance.
Skrmetta v. Bayview Yacht Club, Inc. 806 So.2d 1120, 1124 (¶ 13) (Miss.2002)(citing Spragins v. Sunburst Bank, 605 So.2d 777, 780 (Miss.1992)). The elements of intentional or fraudulent misrepresentation are:
(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.
Johnson v. Black Brothers, Inc., 879 So.2d 525, 529(¶ 14) (Miss.Ct.App.2004) (citing Franklin v. Lovitt Equip. Co., Inc., 420 So.2d 1370, 1373 (Miss.1982)). Neither the record nor the briefs enlighten us as to how the MREC defined the term "misrepresentation."
¶ 58. The MREC described Lanthrip's "substantial misrepresentation" as follows:
Lanthrip made a substantial misrepresentation in connect (sic) with this real estate transaction. He participate (sic) in the preparation of a knowingly false sales contract and allowed the seller to sign a HUD-1 statement falsely certifying that they had no knowledge of loans other than what was listed on the contract. His knowledge of what was put in the sales contract along with his inaction regarding the HUD-1 settlement statement was sufficient evidence to support the Commission's findings that Mr. Lanthrip and McCaughan (as the responsible broker) violated rules of the Mississippi State Real Estate Commission and the Mississippi Statutes governing real estate transactions.
This broad statement simply ignores the actual facts of this real estate transaction.
¶ 59. It is undisputed that Lanthrip represented only the buyers, Scott and Ellie Word. Burton represented the sellers, Rump and White. There was no dual agency. Thus, neither Lanthrip nor his *1187 supervising broker McCaughan owed any duties or obligations to the sellers.[2]
¶ 60. The transaction began when Lanthrip, as the buyers' agent, presented a contract to Burton, as the sellers' agent. As typical, the terms of the contract were negotiated, with several changes in the standard form contract, and eventually agreed to by the parties. Paragraph 2 of the contract established the purchase price. There are several amounts that are included in the blanks, all but one are struck through. When finally agreed to and signed, the contract purchase price was $170,000.
¶ 61. The buyers then attempted to acquire a home mortgage loan from BankPlus.[3] Thereafter, Brad Benton, the mortgage lender for BankPlus, informed the buyers that there was an outstanding debt that had to be satisfied for the mortgage to be secured. When informed of this problem, Lanthrip openly discussed this matter with the buyers, Burton and Benton.
¶ 62. As a result, Lanthrip, Burton and others discussed possible alternatives to solve this problem. One of the suggestions was to increase the amount of the purchase price and allow the debt to be paid from the closing proceeds. Apparently, Lanthrip took the contract, struck through the sales price of $170,000, inserted the amount of $171,750, and had it initialed by the buyers. This revised contract was provided to Burton.
¶ 63. Dale Pruitt, McCaughan's partner and a principal owner of McCaughan & Pruitt Realty, was aware of the need to increase the sales price. Lanthrip discussed the problem with Pruitt, who specifically advised him to prepare a handwritten addendum to the contract that corrected the amount of the sales price to be $171,750. Lanthrip took the addendum to the closing.
¶ 64. The MREC Chief Inspector David Griffith testified that Lanthrip completed the contract according to the buyers' instructions. He also testified that Lanthrip tendered the contract to Burton, the agent for the sellers, with the addendum. Griffith testified that the responsibility of informing the sellers rests with the seller's agent, Burton, rather than Lanthrip. Griffith testified that it would have been an ethical violation for Lanthrip to have any communication with the sellers when they are represented by another agent.
¶ 65. The sellers were aware of the proposed increase in the sales price. Gene Edward Rump, one of the sellers, testified that Lanthrip had informed Burton of the change; and Burton's husband had contacted Rump to inform him of the change. Leigh White, Rump's wife, even testified that she was aware of and had agreed to the change in the final purchase price.
¶ 66. The mortgage lender, Brad Benton of BankPlus, testified unequivocally that he was aware of the change in the sales price from $170,000 to $171,750 and agreed to the increase. He identified the problem with the existing debt, so he was aware of what was proposed and how it was to be handled.
¶ 67. At this point in the transaction, prior to the actual closing, there was absolutely no evidence of a misrepresentation or false statement made by Lanthrip or *1188 McCaughan. The evidence does not establish or infer any attempt to deceive or mislead any party. Lanthrip did not lie or hide any information. Instead, while working through the pre-closing conditions and details of the contract, Lanthrip identified a problem, brought it to the attention of all parties, and tried to correct it so that the transaction could be completed.
¶ 68. The closing was scheduled for May 15, 2001, at the law office of Taylor, Covington and Smith, P.A. The settlement agent listed on the HUD-1 was Taylor Covington. The sellers paid all attorney's fees and expenses. Thus, Taylor Covington acted as counsel for the sellers, Rump and White, and represented only one party in this transaction. Neither the MREC nor the majority discuss the role of the lawyers in this closing. I am of the opinion that the lawyers role was crucial.
¶ 69. The actual closing was handled by Jacqueline Root,[4] an employee of Taylor, Covington. Typical real estate practice requires that the settlement agent prepare certain closing documents, present all documents to the parties for execution, receive and disburse all closing funds, answer any questions relating to the closing documents, and ensure that the closing is completed in accordance with the parties' agreement and the mortgage lender requirements.
¶ 70. The most critical document prepared and signed during a closing is the HUD-1. Here, the HUD-1 was prepared by Taylor Covington and signed by Root. The HUD-1 represents the parties' agreement, and it itemizes the receipt and disbursement of funds that are necessary to complete the transaction. To prepare the HUD-1, Taylor Covington relied on the terms of a written contract or made sure that the HUD-1 was consistent with its client's understanding of the parties' agreement. Certainly, it was incumbent on Taylor Covington to ensure that the terms of the transaction, as itemized in the HUD-1, were acceptable to its client, the sellers.
¶ 71. At the closing, Lanthrip had in his possession a handwritten contract addendum that stated:
Seller agreed to pay to Buyer $1,600.00 at time of closing. Contract price has been amended (sic) to cover $1,600.00 payment. Contract price has been changed from $170,000.00 to $171,750.00.
The contract addendum was signed by the buyers, but the sellers did not sign it.
¶ 72. The majority contends, in paragraph 24, that the MREC had grounds to charge McCaughan with a "misrepresentation because Lanthrip refused to allow the sellers to read the sales contract that had been modified." This is a confusing finding for two reasons. First, if the sellers were not allowed to read it, the contract addendum could not possibly be considered to a be representation made to the sellers. Second, if the sellers did not read it or sign it, then the contract addendum could not modify the terms agreed upon by the parties, and it would not have any legal effect on the transaction whatsoever. As discussed below, the sellers' attorney recognized that it had no legal effect.
¶ 73. At this point in the closing, there was no contract addendum that had been presented or agreed to by the sellers. In *1189 fact, the agreed upon contract sales price was $170,000.00. For the contract sales price to increase, there had to be an agreement or meeting of the minds between the parties to the transaction. It is fundamental to the closing that the closing attorney/agent begins with the correct, and agreed upon, sales price. For any price other than $170,000, there must have been an agreement after the contract addendum that Lanthrip held in his possession.
¶ 74. The sellers' attorney, and closing agent, prepared and presented a HUD-1. The HUD-1 included a purchase price of $171,750.[5] Apparently, the HUD-1 was presented to Rump, and he had some objections to the prepaid expenses. Rump signed all of the documents, including the certification attached to the HUD-1, except the first page of the HUD-1 and gave his wife, White, his power of attorney to sign the HUD-1 later that day. White exercised the power of attorney later that afternoon when she signed the HUD-1 for both Rump and herself. The final HUD-1, just like all other versions prepared by the sellers' attorney, indicated a contract sales price of $171,750.
¶ 75. While at the closing in the office of Taylor Covington, White wrote Scott Word a check for $1,600.00. The MREC contends that this payment was contrary to the HUD-1 certification[6] signed by the sellers. The MREC asserts that the payment of an amount not shown on the HUD-1 was contrary to the certification. The payment certainly may well be contrary to the certification but I cannot find evidence that Lanthrip or McCaughan made a false statement or misrepresentation to the sellers.
¶ 76. First and foremost, neither the MREC nor this Court should ignore the fact that the sellers were represented by their own legal counsel. Taylor Covington acted as the sellers' attorney. Root prepared and reviewed all of the closing documents, including the original contract and addendum. Taylor Covington prepared the HUD-1 and decided what amounts to place in which columns. Taylor Covington had a professional responsibility to advise its clients, the sellers, as to the legal implications of the closing documents and any exchange of funds.
¶ 77. The most important and crucial event occurred at the closing. As the majority discussed, Root declared that the contract addendum, proposed by Lanthrip, was invalid. If a legal representative declared that the contract addendum was invalid, it logically follows that the parties would not be bound by the contract sales price of $171,750 but instead would close the transaction at the original contract sales price of $170,000. Nevertheless, *1190 despite this legal advice, the closing continued and was finalized at a contract sales price of $171,750. The sellers signed all documents and paid the amount to the buyers after the closing. I can only conclude that the sellers, relying solely on the advice of their attorney, either renegotiated the terms of the contract or agreed to the terms of the transaction that were itemized and included in the final HUD-1 signed by White. The record simply does not contain any evidence that Lanthrip made a false or deceptive statement to the sellers.
¶ 78. Lanthrip was a new real estate sales agent. He cannot be held responsible for the advice or actions that were rendered or approved by the sellers' experienced law firm, closing agent and real estate broker. McCaughan could not have offered Lanthrip enough training to make up for a law degree and an extensive amount of practical legal experience of closing loans that Root and Taylor Covington had acquired. All of the events that the MREC complain of occurred under the watchful eye of an experienced law firm. Root and Taylor Covington were available to provide any legal advice that the sellers requested. Root and Taylor Covington had the professional obligation to protect the sellers from any illegal act. Certainly, Lanthrip did nothing to deceive or mislead Root and Taylor Covington. The MREC's finding essentially subjects all real estate agents to disciplinary action based on the incorrect or bad legal advice given by attorneys. Such cannot be allowed to stand.
¶ 79. Next, there is no evidence to indicate that the sellers relied on any statement by Lanthrip or McCaughan. In their sworn statement filed with the MREC, Rump and White stated under oath the following:
I arrived at the offices of Taylor, Covington and Smith, and proceeded with the closing. We signed all of the necessary paperwork, including the revised HUD statement. At the time of the exchange of checks, I wrote a personal check from our joint household account for the amount of $1,600.00 to Scott Word. This was money that we were told we needed to pay in order for the deal to go through. The reasons given for the need to write this check were vague, we did not question it at the time, but Susan Burton assured us it was no big deal, and necessary for the deal to happen. Later, our attorney, Bill Waller, informed us that this was an illegal act on our part, indicating we signed papers saying we did not participate in any special financing needs for this deal to proceed. We proceeded with this payment under the advice of our real estate agent, Susan Burton, because we felt she was the expert, and by using her as our paid professional with years of experience, we could follow her advice with the assumption that it was legal and ethical. We paid her over $7000.00 as our professional representative and agent in this matter, and feel that she did not represent us ethically or professionally.
(Emphasis added.)
¶ 80. The sellers' sworn statement blames only Burton and rightfully so. It clearly indicates that they did not rely on the representation of Lanthrip or McCaughan. To the contrary, the evidence unequivocally establishes that Lanthrip took all necessary precautions to achieve full disclosure. Any complaint that the sellers had was against Burton, Root and Taylor Covington.
¶ 81. Finally, all parties to this transaction were aware that the final purchase price was increased to $171,750. They each testified that they understood its significance in closing the sale. The record *1191 proves their knowledge beyond a reasonable doubt. Rump and White signed the HUD-1, closed the transaction, and accepted the additional consideration that was represented in the amended contract. I find absolutely no evidence to support a charge of misrepresentation by Lanthrip or McCaughan.

b. Did Lanthrip's conduct constitute bad faith, incompetency, dishonesty or improper dealing?
¶ 82. The MREC also alleged that Lanthrip's and McCaughan's conduct constituted bad faith, incompetency, dishonesty, or improper dealing under Mississippi Code Annotated section 73-35-21(1)(m). Again, the record is void of any evidence to support this allegation.
¶ 83. Neither the MREC nor the majority specify the evidence that supports such wrongful conduct. Lanthrip's attempts to disclose the problem with the buyers' debt and the resulting proposed change in the purchase price refute this allegation. Lanthrip's actions were fully disclosed. Lanthrip was attempting to solve a problem. All parties, the sellers, the mortgage lender, the buyers, the real estate agents and the attorneys were all clearly aware of and agreed to the change in the final purchase price. I can find no evidence of bad faith, incompetency, dishonesty or improper dealing by Lanthrip or McCaughan.

c. Did Lanthrip's conduct violate the MREC rules or regulations?
¶ 84. The MREC Rule IV.B.5 provides that "[n]o licensee shall represent to a lender or any other interested party, either verbally or through the preparation of a false sales contract, an amount in excess of the true and actual selling price." The MREC Rule IV.E.2.g.5. provides that "`[r]easonable skill, care and diligence'the agent must perform all duties with the care and diligence which may reasonably be expected of someone undertaking such duties."
¶ 85. I find no evidence that Lanthrip violated either of these rules or regulations. There is no evidence that Lanthrip represented to BankPlus, or any other lender, a selling price in an amount of the true and actual selling price. Indeed, there is no evidence that Lanthrip represented a false selling price to anyone. One must simply look to the HUD-1 signed by the sellers. Taylor Covington prepared the HUD-1 and agreed. The HUD-1 stated that the actual agreed upon sales price was $171,500. The sellers signed the HUD-1, they accepted the consideration, and the MREC may not now argue that $171,500 was not the true and actual selling price. The transaction was signed off by all parties that $171,500 was indeed the true and actual selling price.
¶ 86. By their own testimony, the sellers knew that the buyers had an existing debt that must be satisfied before the sale could proceed. The testimony of the MREC's own investigator established Lanthrip's good faith efforts when he stated that the addendum offered by Lanthrip would have operated to satisfy the sellers' representation in the HUD-1 certification and accomplish full disclosure had the sellers signed the proposed addendum. Griffith testified that the purpose of the addendum to the contract was to achieve consistency between the HUD statement and the sales contract. Griffith further testified that since Burton was the representative of the sellers, it was her obligation to make them aware of the changes in the contract.
¶ 87. Based upon the record, I cannot find evidence to support a finding that Lanthrip or McCaughan violated any law, rule, or regulation. Therefore, I disagree with the majority's finding McCaughan liable *1192 for the actions of Lanthrip when a violation did not occur. I believe that the circuit court should be affirmed.

2. Whether Sara McCaughan had a duty to act in her capacity as a supervisor under the circumstances and if so, whether she violated her duty to provide adequate supervision.
¶ 88. Since I find that Lathrip did not violate any law, rule or regulation, I do not believe it necessary that I address whether McCaughan violated her duty to provide adequate supervision. Nevertheless, I address the MREC's findings on this issue. Again, I find them to lack sufficient evidence.
¶ 89. The MREC's findings of fact does not even address McCaughan's duty to supervise. There were no findings or conclusions as to how or why her supervision was inadequate or insufficient. Instead, the MREC's sole reference to McCaughan's duty was in the conclusions of law when it held:
The [MREC] further finds that the extent and quality of supervision of salesperson Lanthrip by Respondent McCaughan was inadequate and insufficient and therefore was in violation of Commission rules and regulations.
¶ 90. As discussed above, the only specific finding of wrong-doing related to the actions of Susan Burton. The MREC found that Lanthrip had asked Burton several times to obtain the sellers' acknowledgment of the change in the purchase price and return a copy to Lanthrip. The MREC found that it was Burton who failed to secure this acknowledgment. Given that Burton was not under the supervision of McCaughan, I fail to see how the wrongs of Burton can be imputed to McCaughan. It was Lanthrip who was licensed under McCaughan, and therefore, McCaughan's duty extended to Lanthrip.
¶ 91. Even if the MREC was correct to conclude that Lanthrip did violate the enumerated statutes or rules and regulations, I would still render a different conclusion than the majority on this issue.
¶ 92. The only evidence that could possibly support the MREC conclusion is the testimony of Lanthrip. However, a close examination of Lanthrip's testimony reveals that MREC's reliance is misplaced. Lanthrip contradicted himself in his testimony about McCaughan's supervision. The MREC would have us believe that no one ever accompanied or assisted Lanthrip on any real estate transaction. However, earlier in his testimony, Lanthrip described in detail a transaction where he was accompanied by Gerald Thomas, his supervisor at McCaughan & Pruitt, and the praise he received upon its completion.
¶ 93. The MREC further argues that McCaughan failed to provide adequate supervision because she should have done "something" to get directly involved once she was notified of the possibility of problems with the transaction. However, there is no evidence as to how McCaughan should have been involved or how McCaughan could have protected or satisfied the sellers more than their real estate lawyer or broker. The MREC simply argues that McCaughan "chose not to act or to ask anyone else" to get involved. McCaughan testified that when her partner, Dale Pruitt, informed her of the problems with the transaction she told him to remain involved and keep her informed. A finding that she should have done "something" is arbitrary and simply is not a sufficient finding for us to review.
¶ 94. The record provided ample evidence to attest the proper supervision by McCaughan. The record contained the training documents used by McCaughan in *1193 her real estate practice and were introduced as evidence. Testimony established that these training documents were used daily to educate and train the sales representatives, including Lanthrip. Lanthrip testified that the sales representatives under McCaughan, including himself, received "one-on-one" training by McCaughan; that McCaughan held herself out to be available for consultation and support; and that McCaughan was accessible to all agents under her supervision or provided for access to her partner, Dale Pruitt. Lanthrip also testified about the supervision given him by McCaughan's employee, Gerald Thomas.
¶ 95. Given that the burden of proof requires the MREC to prove its case against Sara McCaughan by clear and convincing evidence, I cannot agree with the majority that there exists substantial evidence supporting this heightened burden of proof. The record fails to support the MREC's findings that Lanthrip committed any act of misrepresentation, or conduct which rises to the level of dishonesty, fraud, or improper dealing. Lanthrip went to great lengths to achieve full disclosure establishing due care and diligence as a sales representative. I simply fail to see how McCaughan can be held responsible based on the evidence before the MREC.
¶ 96. Accordingly, I would affirm the decision of the circuit court.
LEE, P.J., AND BARNES, J., JOIN THIS SEPARATE OPINION.
NOTES
[1] Rump testified that he wanted to sell the house as soon as possible so that he would not have to make another mortgage payment.
[2] It is also important to note that the sworn statement, filed by the sellers with the MREC, did not allege misconduct or wrongdoing by Lanthrip or McCaughan. The sellers' complaints were directed toward their broker, Burton.
[3] Paragraph 2(b) of the contract also provided that the contract was contingent on the buyers qualifying for a loan.
[4] The majority and the MREC's brief incorrectly refer to Root as the closing attorney. The record contains a letter from Root to the MREC that discussed the transaction. From this letter, Root does not claim that she is an attorney, but she is instead identified as a "settlement agent." According to the roll of attorneys maintained by The Mississippi Bar, this Court may and should take judicial notice that Root is not a licensed attorney. Nevertheless, the MREC's contention that Root was a lawyer further supports my conclusion.
[5] The record contained four separate copies or versions of the HUD-1. My review and comparison of the HUD-1s indicates that there was a change made in who would pay for certain of the prepaid expenses and that Rump signed the certification, attached to the HUD-1, before the final version of the HUD-1 was completed by Root. More important to our discussion, however, each and every version of the HUD-1 listed the contract sales price to be $171,750.
[6] The certification read:

I certify that I have no knowledge of any loans that have been or will be made to the borrower(s), or loans that have been or will be assumed by the borrowers(s), for the purposes of financing this transaction, other than those described in the sales contract [date omitted] (including addenda). I certify that I have not and will not pay or reimburse the borrower(s) for any part of the cash downpayment. I certify that I have not and will not pay or reimburse the borrower(s) for any part of the borrower's closing costs which have not been previously disclosed in the sales contract (including any addenda).